## SALTZMAN v. GREAT AMERICAN INDEMNITY CO. OF NEW YORK.

Civ. A. No. 361.

United States District Court
W. D. Arkansas, Harrison Division.

Oct. 29, 1953.

Thomas B. Tinnon, Mountain Home, Ark., for plaintiff.

Owens, Ehrman & McHaney, Little Rock, Ark., for defendant.

JOHN E. MILLER, District Judge.

### Statement

The case was submitted to the Court upon the pleadings, the stipulation of facts and exhibits thereto, and the briefs of the parties in support of their respective contentions, and the Court, having considered the same, now makes and files herein its findings of fact and conclusions of law, separately stated.

### Findings of Fact

1.

The plaintiff is a citizen and resident of Mountain Home, Arkansas, in the Western District. The defendant is a corporation organized and existing under the laws of the State of New York

and is engaged in and duly authorized to carry on the business of public liability insurance in the State of Arkansas. The matter in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

### 2.

It was agreed by stipulation of parties filed on September 9, 1953, that:

"1. The defendant, Great American Indemnity Company, issued its policy of insurance numbered LHC 98924 to the plaintiff, B. N. Saltzman, on the 13th day of June, 1950. Said policy was designated a 'comprehensive personal liability policy', and a photostatic copy of said policy of insurance is attached hereto and made a part hereof, it being agreed that said photostatic copy is a true and correct copy of the original and contains all of the provisions pertinent to the issues involved in this cause.

"2. On November 28, 1951, a 1949 Ryan Navion airplane owned by the Veterans of Foreign Wars of the United States and being piloted by Bruce Campbell, a salaried employee of the Veterans of Foreign Wars, was landed at the Flippin, Arkansas, airport while engaged on the official business of the owner. The Commander-in-Chief of the Veterans of Foreign Wars, Frank C. Hilton, was the only passenger in said airplane.

"3. Shortly after the landing of said plane, the aforementioned Campbell and Hilton left the airport after the pilot had been instructed by Mrs. Genevia Crane, wife of the operator of said airport, to leave the plane unlocked and with brakes off and disengaged at a place where the plane had come to rest. These instructions by Mrs. Crane were given for the purpose of facilitating the storage of said airplane in the hangar. The pilot, Bruce Campbell, complied with the instructions of Mrs. Crane and left said plane with its engines stopped or dead, with all switches, throttles, and controls in their normal position.

"4. The plaintiff, B. N. Saltzman, is a regularly licensed and practicing physician in the trade area of Mountain Home, Baxter County, Arkansas. He is also the operator of his own aircraft and has been duly licensed as a private pilot. The plaintiff had landed his own aircraft at the Flippin airport some ten or fifteen minutes prior to the landing of the airplane of the said Veterans of Foreign Wars and was informed that the national commander of the Veterans of Foreign Wars would land at that airport and remained to meet the national commander and to observe the Ryan Navion aircraft in which the commander was a passenger.

"5. After the national commander of Veterans of Foreign Wars, his pilot, and the reception committee departed from the airport, the plaintiff, B. N. Saltzman, walked out to the Ryan Navion aircraft and, being an aviation enthusiast and having considered the purchase of such an aircraft, he availed himself of this opportunity to inspect and examine said aircraft. The plaintiff walked around the aircraft two or three times and then stepped up onto the wing at the passenger walkway to better observe the interior of the airplane cabin. The cabin hatch being unlocked and open, the plaintiff stepped into the cabin without the permission or knowledge of Hilton, Campbell, or Mrs. Crane, placed himself in the pilot seat, and began an examination of the various instruments, switches, button controls, and equipment upon said airplane. After four or five minutes of such examination, and after having actually operated various controls, switches, and control buttons, the plaintiff engaged the aircraft starter. The plaintiff engaged the starter control

knowing at the time that it was the starter control and with the intention of engaging said control, but without the intent to start the engines. He engaged said starter control under the impression that it could be engaged without actually energizing or starting the engines. Due to the position of the throttle, electric system, master switch, ignition switch, electric fuel pump, and primer control, the aircraft engines energized or started when the starter control was engaged by the plaintiff, and the aircraft began to move. The plaintiff, as a result of his pilot's training, immediately and automatically sought to set the airplane wheel brakes by attempting to depress the brake foot controls, which on the airplane to which plaintiff was accustomed are an integral part of the foot actuated rudder control. The Ryan Navion airplane was not equipped with the brake actuating mechanism with which the plaintiff was familiar. When the plaintiff's efforts to engage the brakes in the aforesaid manner failed to stop the aircraft, the plaintiff became excited and began looking for the brake actuating controls. Due to the position in which the throttle had been left by the pilot of the aircraft, the aircraft accelerated in forward motion rapidly when the engines were started. During the short period of time in which the plaintiff was searching for a brake control, the aircraft traveled approximately 90 to 100 feet and crashed into the side of the Flippin airport hangar, shearing off one wing and causing the aircraft to spin into the hangar, thereby damaging the aircraft to the extent hereinafter set out. The plaintiff later learned that this particular type of aircraft was equipped with a hand-operated brake control situated on the instrument panel directly in front of the pilot's seat.

"6. The cost of repairs to the Ryan Navion airplane owned by the Veterans of Foreign Wars as a result of the collision hereinbefore set out was $3,532.08, and an action was instituted against the plaintiff in the United States District Court for the Western District of Arkansas, Harrison Division, by the Insurance Company of North America and Veterans of Foreign Wars of the United States to recover the damages they sustained as a result of said collision. A judgment was rendered against the plaintiff, B. N. Saltzman, in said action in the sum of $3,569.58, which included the costs of said action, and said judgment was paid by the plaintiff in full on or about the 11th day of May, 1953, and has been satisfied of record.

"7. The policy of insurance issued to the plaintiff by the defendant on the 15th day of June, 1950, was in full force and effect at the time of the collision wherein the Ryan Navion airplane was damaged, as hereinbefore set forth. The plaintiff gave notice to the defendant company within time and in accord with the provisions of said policy of insurance. The plaintiff gave to the company additional notice of the institution of the action instituted against him by the Insurance Company of North America and the Veterans of Foreign Wars and tendered to it the defense of said cause, and, further, gave notice to the company of the rendition of the judgment and demanded payment of said judgment of the company prior to its satisfaction by the plaintiff.

"8. The company has denied that it was obligated to pay the damages paid by the plaintiff under the circumstances hereinbefore set out, contending that its policy of insurance did not cover or indemnify the plaintiff for any loss that he

might sustain under the facts agreed upon in this stipulation.

"9. The plaintiff has actually paid to his attorney, Thomas B. Tinnon, the sum of $1,256.00 for his services rendered in the case of Insurance Company of North America v. Saltzman, infra.

"10. This stipulation contains all the facts pertinent to the issues involved in this cause, and no further evidence shall be offered in the disposition of this litigation."

### 3.

The policy issued to the plaintiff provides that the defendant agrees with the insured, subject to exclusions, conditions and other terms of the policy, "To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law. * * * for damages because of injury to or destruction of property, including the loss of use thereof."

Under the title "Exclusions" the policy provides that it does not apply "to the ownership, maintenance or use, including loading and unloading, of * * aircraft," or to "injury to or destruction of property used by, rented to or in the care, custody or control of the insured."

### 4.

Part II of the policy provides that "As respects such insurance as is afforded by the other terms of this policy under Coverage A the company shall (a) defend in his name and behalf any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent * * *."

As heretofore stated in finding of fact No. 2, the defendant denied that the occurrence was covered by the policy and refused to defend the action brought against the plaintiff by the Insurance Company of North America and Veterans of Foreign Wars of the United States.

### 5.

■ Considering the issues, amount of work involved, experience of plaintiff's attorney, result of the litigation, and other factors present in the disposition of this case, the Court is of the opinion that a reasonable attorney's fee for plaintiff is $750.

### Discussion.

The parties agree that the question for determination is whether the occurrence and damages in this case were excluded from coverage of the policy issued to the plaintiff by the defendant.

The plaintiff contends that the exclusionary clauses are inapplicable because (1) the aircraft clearly was not rented to or owned or maintained by plaintiff; (2) it was not in the care, custody or control of plaintiff since he had no right to possession, (3) the aircraft was not being used by plaintiff because (a) the term "use" means long, continued use, which was not present in this case, and (b) the term "use" means to employ or utilize for an advantageous purpose, and would not apply to the facts in this case; and (4) any ambiguity should be construed favorably to plaintiff.

The defendant contends that the exclusionary clauses are applicable because (1) the aircraft was in the care, custody and control of plaintiff; (2) long or continued use is unnecessary and one use is sufficient to come within the exclusionary clauses; (3) the plaintiff was "using" the aircraft for the purpose of examination; and (4) the rule of construction as to exclusions is not as strict as the rule with respect to forfeitures.

■■ Before considering, in detail, the contentions of the parties, the Court feels that the general rules of construction should be mentioned briefly. The policy was issued and delivered to the insured in Arkansas, and thus the Arkansas law governs the substantive rights of the parties. John Hancock Mut. Life Ins. Co. of Boston, Mass. v. Munn, 8 Cir., 188 F.2d 1, 3. The general rules of construction of insurance policies in Arkansas are summarized in

Kinard v. Mutual Benefit Health & Accident Ass'n of Omaha, Neb., D.C.Ark., 108 F.Supp. 780, 783, as follows:

"* * * when the language of the policy is clear and unambiguous the policy should be construed as any other contract and the language should be given its natural meaning, i. e., the interpretation which an ordinary person would place upon it. Life & Casualty Ins. Co. of Tennessee v. De Arman, 192 Ark. 11, 90 S.W.2d 206; Hearin v. Standard Life Ins. Co., D.C.E.D.Ark., 8 F.2d 202. Moreover, the policy should be considered and construed as a whole. National Life Ins. Co. v. Gregg, 168 Ark. 80, 269 S.W. 62; Hearin v. Standard Life Ins. Co., supra. But, if the policy is ambiguous and susceptible to more than one reasonable construction, the law is well settled that the construction most favorable to the insured should be adopted. Martin v. Mutual Life Ins. Co. of N. Y., 189 Ark. 291, 71 S.W.2d 694; Travelers' Protective Association of America v. Stephens, 185 Ark. 660, 49 S.W.2d 364; American Standard Life Ins. Co. v. Meier, Ark., 246 S.W.2d 128."

These rules of construction furnish a helpful guide to the Court in the consideration of the contentions of the parties.

The policy in question in the instant case is styled "Comprehensive Personal Liability Policy" and evidently is intended as a "catch-all" policy to cover the types of liability not covered in the ordinary automobile, aircraft, watercraft, and similar liability policies. The general insuring clause pertinent herein obligates the defendant "To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law * * * for damages because of injury to or destruction of property * * *." The two exclusionary clauses relied upon by defendant provide that the policy does not apply "(b) to the ownership, maintenance or use, including loading and unloading, of * * * (3) aircraft * * *" or "(e) under coverage A, to injury to or destruction of property used by, rented to or in the care, custody or control of the insured; * * *" (coverage A is the general insuring clause quoted above).

Unquestionably the aircraft involved herein was not owned by, maintained by, or rented to the plaintiff, and defendant makes no contention to the contrary. Therefore, those terms in the exclusionary clauses may be disregarded, leaving only for determination the question of whether the aircraft was being "used" by plaintiff or was in his "care, custody or control."

Defendant contends that the aircraft was in the care, custody and control of the plaintiff, even though plaintiff was a trespasser, and cites the following cases in support of this contention: Sky v. Keystone Mut. Casualty Co., 150 Pa. Super. 613, 29 A.2d 230; Monroe County Motor Co. v. Tennessee Odin Ins. Co., 33 Tenn.App. 223, 231 S.W.2d 386, 388; Jacobson v. Aetna Casualty & Surety Co., 233 Minn. 383, 46 N.W.2d 868; Hardware Mutual Casualty Co. v. Mason-Moore-Tracy, Inc., 2 Cir., 194 F.2d 173; Vaughan v. Home Indemnity Co., 86 Ga.App. 196, 71 S.E.2d 111; John G. Speirs & Co. v. Underwriters at Lloyd's London, 84 Cal.App.2d 603, 191 P.2d 124; and State Automobile Mut. Ins. Co. v. Connable-Joest, Inc., 174 Tenn. 377, 125 S.W.2d 490, 491. However, the Court is of the opinion that in actuality these decisions support plaintiff's contention that he did not have the care, custody or control of the aircraft. All the cases cited by defendant are cases in which the person had the *right* to possession, even though such right might have been temporary, and those cases recognize that the terms "care, custody and control" presuppose a right to possession on the part of the person exercising such care, custody or control. In Monroe County Motor Co. v. Tennessee Odin Ins. Co., supra, the Court at pages 395, and 396 of 231 S.W.2d said:

"The words 'charge' and 'custody' are frequently used as synonyms. The lexicographers give them as such. * * *

"In support of its contention that the right to control the operation of the car is determinative, the defendant refers us to the case of Cohen & Powell v. Great American Ind. Co., 127 Conn. 257, 16 A.2d 354, 355, 131 A.L.R. 1102. * * * It is true that there the Court said: 'While the word "charge" has a very broad and varied meaning, * * * a person or thing is not "in charge of" an insured within the meaning of the policy unless he has the *right to exercise dominion or control over it*'. But this observation must be considered in the light of the facts with which the court was dealing. When so considered, it is obvious that what was meant was the *right to actual physical control of the vehicle*. Hence, if anything, the case supports the contention of the complainant rather than that of the defendant." (Italics added by Court.)

In Sky v. Keystone Mut. Casualty Co., supra, the Court at page 232 of 29 A.2d said:

"In Words & Phrases * * * [Volume 6, Page 563], the phrase 'in charge of' is defined as follows: 'In the care or custody of, or intrusted to the management or direction of' * * *.

"We are of the opinion that when the act in question in section 1(d), as amended, 75 P.S. § 1253(d) refers to 'property of others in charge of the insured,' it does not mean mere 'possession'; and that property is not in charge of the insured unless he has the *right to exercise dominion or control over it*." (Italics added by Court.)

In John G. Speirs & Co. v. Underwriters at Lloyd's London, supra, the Court at page 125 of 191 P.2d said:

"In Black's Law Dictionary, 'control' is defined as follows: 'Power or authority to manage, direct, superintend, restrict, regulate, direct, govern, administer, or oversee.' "

Not only do the cases cited by defendant support the contention of plaintiff, but there are also many other cases likewise supporting plaintiff's position. See, Cohen & Powell, Inc., v. Great American Indemnity Co., 127 Conn. 257, 16 A.2d 354, 131 A.L.R. 1102; National Fire Ins. Co. v. Davis, Tex.Civ.App., 179 S.W.2d 316, 318, 319; Southern Carbon Co. v. State, 171 Misc. 566, 13 N.Y.S.2d 7, 9.

In other words, the terms "care," "custody" and "control" imply at least a temporary right to possession, and, since the plaintiff in the instant case was a mere trespasser with no right to possession whatsoever, he did not have the "care, custody or control" of the aircraft.

This brings the Court to the critical issue in the case, was the plaintiff "using" the aircraft within the contemplation of exclusionary clauses of the policy?

Plaintiff argues that the term "use" should be construed to mean long or continued use, while the defendant counters with the argument that, although such a construction might be valid in the event of a warranty or forfeiture, in this case the term is used in an exclusionary clause and should be construed to require only one use. These contentions present an interesting question, especially in view of the decisions in Woodmen of the World Life Insurance Society v. Reese, 206 Ark. 530, 176 S.W.2d 708; Firemen's Insurance Company of Newark v. Rye, 160 Ark. 212, 254 S.W. 465; Maringer v. Bankers Indemnity Ins. Co., 288 Ill.App. 335, 6 N.E.2d 307, 311; and American Indemnity Co. v. Jagoe, Tex.Civ.App., 73 S.W.2d 574. But the Court need not concern itself with these arguments in view of the disposition of the principal remaining contention of the parties.

Even though it be held that one "use" of the aircraft would be sufficient to exclude the occurrence from the coverage of the policy, the Court is convinced that plaintiff did not "use" the aircraft within the contemplation of the exclusionary clauses.

As heretofore stated, the policy involved herein is a general liability policy designed and intended to cover any and all personal liability incurred by the plaintiff except that expressly excluded, and the ultimate question is whether the parties intended to exclude an occurrence such as the one disclosed by the facts in this case.

In the first place, it may be noted that it is extremely doubtful if anyone through any stretch of the imagination could have possibly contemplated such an accident as the one which happened in this case, and thus it may safely be assumed that the parties did not contract with the specific intent to exclude the unique accident involved herein. But, of course, the real question is whether the language used in the exclusionary clause, when given its natural meaning, is sufficient to exclude the occurrence and the damage to the aircraft.

Various courts have discussed and defined the term "use" and the following are examples of common definitions given to the said term:

"'In use' is defined to be 'in employment;' 'out of use' to be 'not in employment;' 'to make use of, to put to use' to be 'to employ, to derive service from.'" Astor v. Merritt, Collector, 111 U.S. 202, 213, 4 S.Ct. 413, 419, 28 L.Ed. 401.

"Webster's New International Dictionary, 2d Ed., defines the word 'use' as follows: 'Act of employing anything.' The New Century Dictionary defines it as follows: 'To employ for some purpose, put into service, or make use of * * *; apply to one's own purposes.'" Samuels v. American Automobile Ins. Co., 10 Cir., 150 F.2d 221, 223, 160 A.L.R. 1191.

"In the instant case the terms in question are 'use' and 'using'. Now a car would be used by a person, whether it was operated personally or through the services of another. If the insurer meant that liability should only attach when it was being operated or driven by the owner or some one with his consent, and it is claimed that the word 'used' includes the term 'operated'—then the insurer should have employed the word carrying in its meaning the narrower limitation of liability.

"The word 'use' is defined as the 'purpose served—a purpose, object or end for useful or advantageous nature.' (Oxford English Dictionary.)

"This implies that the person receives a benefit from the employment of the factor involved. It is this benefit, purpose, or end which defines the use. I use a chisel to chip out a piece of wood. The removal of the wood is the use to which I put the tool. * * * I employ an automobile for the purpose of transportation. I use it for the purpose of going from here to there." Brown v. Kennedy, 141 Ohio St. 457, 48 N.E.2d 857, 49 N.E.2d 417, 418. See also, American Automobile Ins. Co. v. Taylor, D.C. Ill., 52 F.Supp. 601.

"Webster's Dictionary defines the word 'use' as an act of employing or state of being employed; to convert to one's service; to employ." Treolo v. Iroquois Auto Ins. Underwriters, 348 Ill. 93, 180 N.E. 575, 576.

Webster's New International Dictionary, Second Edition, defines the verb "use" as follows: "To convert to one's service; to avail oneself of; to employ; as, to *use* a plow, a chair, a book * *. To put into operation; to cause to function; as, for his purposes he used the

same machinery and the same skill he had previously used."

■ Of course if the term "use" is construed to embrace all its possible meanings and ramifications, practically every activity of mankind would amount to a "use" of something. However, the term must be considered with regard to the setting in which it is employed. In the instant case the policy excludes injury to property used by the insured and does not apply to the use, including loading and unloading, of aircraft. The Court is convinced that the term "use" as employed in the exclusionary clauses was intended to mean and does mean the *ordinary* use or employment of the property or aircraft. As the Court said in Brown v. Kennedy, supra, "I employ an automobile for the purpose of transportation. I use it for the purpose of going from here to there." That is, the term "use" in the exclusionary clauses means the employment, in the case of aircraft, of the property for the carrying of passengers or cargo, and is not broad enough to cover the inquisitive inspection of or meddling with an airplane by a person who is interested in purchasing a similar aircraft. This view is fortified by the fact that the aircraft exclusionary clause provides that the policy shall not apply to the use, "including loading and unloading," of aircraft. It is evident from this provision that the clause was intended to exclude the ordinary and natural use of aircraft for transportation purposes, and to extend the exclusion to the loading and unloading of the aircraft preparatory to and subsequent to the actual flight.

Suppose a person were considering the purchase of a hoe for use in his garden, and, seeing a hoe in his neighbor's yard, he walked over, picked it up, and began inspecting it. It is doubtful if anyone would contend that, while he was inspecting the hoe, he was "using" it, because when one thinks of the use of a hoe he thinks of the employment of the hoe for weeding a garden, chopping cotton, or one of the ordinary uses to which a hoe is put and utilized. By the same token, when one thinks of the "use" of an airplane he thinks of the employment of the airplane for the transportation of passengers or cargo, i. e., its ordinary uses, and would not consider the inspection of an airplane by a prospective purchaser of such an airplane a "use" of the said airplane.

Defendant cites and relies upon the following cases as substantiating its contention that plaintiff was "using" the aircraft within the exclusionary clauses of the policy:

Lee v. Aetna Casualty & Surety Co., 2 Cir., 178 F.2d 750; Red Ball Motor Freight, Inc., v. Employers Mut. Liability Ins. Co. of Wisconsin, 5 Cir., 189 F.2d 374; and Roche v. United States Fidelity & Guaranty Co., 247 App.Div. 335, 287 N.Y.S. 38.

These decisions, however, are clearly distinguishable from the instant case.

First, in all of these cases the act causing the injury occurred while the vehicle or device was being prepared or serviced for employment in its *ordinary* and *natural* use. In Lee v. Aetna Casualty & Surety Co., supra, the injured person was intending to "use" the elevator in the customary manner when he stepped into the elevator shaft; in Red Ball Motor Freight, Inc. v. Employers Mut. Liability Ins. Co. of Wisconsin, supra, and Roche v. United States Fidelity & Guaranty Co., supra, the act causing the injury occurred while the vehicles were being fueled for their *ordinary* and *natural* use as means of transportation. But, in the instant case, the act causing the injury occurred while the plaintiff was investigating and meddling with the aircraft, not for the purpose of employing the aircraft for its ordinary and natural use of transporting passengers or cargo, but because he had considered the purchase of such an airplane and was curious about the same.

Second, the Roche and the Red Ball cases, supra, were both construing omnibus clauses of liability policies which *extended* coverage of the policy to injuries caused by the ownership, main-

tenance or use of the automobile, rather than *excluding* such coverage as is done in the instant case, and in those cases the Courts applied the liberal rule of construction in favor of the *coverage* of the occurrences there presented. For example, in Roche v. United States Fidelity & Guaranty Co., supra, the Court at page 40 of 287 N.Y.S. said:

"In resolving the question, we have in mind the tendency of the courts to give liberal interpretation to statutes which protect from loss those in any way injured by the acts of the insured and give them benefit of insurance policies."

And, in Red Ball Motor Freight, Inc. v. Employers Mut. Liability Ins. Co. of Wisconsin, supra, the Court at page 378 of 189 F.2d said:

"We rest our holding broadly upon the view, fully developed by the Supreme Court of Missouri, in Schmidt v. Utilities Ins. Co., supra, (353 Mo. 213, 182 S.W.2d [181] 185 [154 A.L.R. 1088]) that the words 'arising out of the ownership, maintenance, or use of the (truck)' are not words of narrow and specific limitation, but are broad, general, and comprehensive terms *effecting broad coverage* and that they are intended to, and do afford protection to the insured against liability imposed upon him for all damages caused by acts, of his employee in charge of the operation or use of the truck, done in connection with or arising out of such use." (Italics added by Court.)

Stated differently, the defendant in the instant case is attempting to convert the liberal rule favoring *coverage* of a policy into an illiberal rule favoring broad interpretation of the *exclusionary* clauses of a policy. But, where the term "use" is employed in an exclusionary clause, the courts tend to restrict, rather than enlarge, the term. See, Maryland Casualty Co. v. Beckham, 163 Miss. 836, 143 So. 886; Universal Automobile Ins. Co. v. Noel, 9 Cir., 64 F.2d 916. See also, St. Louis, Iron Mountain & Southern Railway Company v. Wiseman, 119 Ark. 477, 483, 177 S.W. 1139 (use and operation of a railroad); Bailey v. State, 150 Tenn. 598, 266 S.W. 122 (criminal statute).

At this point it may be noted that under the Arkansas law, contrary to defendant's contention, the same rule of strict construction that applies in the case of forfeitures also applies in the case of exclusions. In Missouri State Life Ins. Co. v. Martin, 188 Ark. 907, 916, 69 S.W.2d 1081, 1085, the Court said:

"Counsel for appellant erroneously contend that, because the language relied upon does not create a forfeiture of the policy, but simply states a risk which was never assumed, the rule that the language of the phrase involved should be strictly construed—and, where ambiguous, against the insurance company—has no application. The rule of strict construction applies to exemption from liability as well as to forfeitures."

See also, Martin v. Mutual Life Ins. Co. of New York, 189 Ark. 291, 295, 71 S.W.2d 694; Kinard v. Mutual Benefit Health & Accident Ass'n of Omaha, Neb., supra, 108 F.Supp. at page 793; Note, 1 Arkansas Law Review 186.

Even if the construction that the defendant urges, i. e., that the word "use" covers every conceivable contact, touch, or examination of aircraft or property, were a possible interpretation of the word, nevertheless, any ambiguity would be resolved in favor of the insured, and the construction favoring coverage of the policy would be adopted. Martin v. Mutual Life Ins. Co. of N. Y., supra; American Standard Life Ins. Co. v. Meier, 220 Ark. 109, 246 S.W.2d 128; Missouri State Life Ins. Co. v. Martin, supra. But, for the reasons heretofore stated, the Court is convinced that the only logical construction of the word "use" as employed in the exclusionary clauses of the policy involved herein is that the word was intended to cover only such employment or utilization of air-

craft or other property as is ordinary and natural, and was not intended to cover such an occurrence as the one disclosed by the facts in this case.

Therefore, plaintiff was not "using" the aircraft within the meaning of the exclusionary clauses of the policy, and he is entitled to recover of and from the defendant the amount of the judgment rendered against him in the case of Insurance Company of North America v. Saltzman, D.C.Ark., 111 F.Supp. 694. Moreover, it was the duty of the defendant to defend said action, See, Maryland Casualty Co. v. Dalton Coal & Material Co., 8 Cir., 184 F.2d 181, and since it failed to do so it is liable to the plaintiff for costs and for the reasonable amount plaintiff paid to his attorney for the defense of said action. See, Hardware Mut. Casualty Co. v. Schantz, 5 Cir., 186 F.2d 868; Boutwell v. Employers' Liability Assurance Corporation, Ltd., 5 Cir., 175 F.2d 597; 45 C.J. S., Insurance, § 933b., p. 1059. (Plaintiff paid his attorney the sum of $1,256 for the defense of the said action, and defendant makes no contention that this was not a reasonable fee.) And, of course, plaintiff is entitled to recover of and from the defendant the statutory penalty of twelve per cent plus a reasonable attorney's fee and costs in this action. Section 66–514, Arkansas Statutes 1947, Annotated; Traders & General Ins. Co. v. Powell, 8 Cir., 177 F.2d 660, 667–668.

### Conclusions of Law

1.

The Court has jurisdiction of the parties to and the subject matter of this cause of action.

2.

The occurrence in this case was covered by the policy issued to the plaintiff by the defendant, and plaintiff is entitled to recover of and from the defendant the amount of the judgment entered against the plaintiff in the case of Insurance Company of North America v. Saltzman, D.C.Ark., 111 F.Supp. 695, which amount, including costs, was $3,569.58.

3.

By failing to defend the said action, defendant breached its contract with plaintiff, and plaintiff is entitled to recover of and from the defendant the additional amount of $1,256 he was required to expend for attorney's fee in defending said action.

4.

Also, plaintiff is entitled to recover of and from the defendant the sum of $579.07, being the statutory penalty of twelve per cent, plus a reasonable attorney's fee of $750, and costs.

A judgment in accordance with the above should be entered.